J-S18017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| JENNA BARKER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALEX BARAK | : | |
| | : | |
| Appellant | : | No. 1234 MDA 2025 |

Appeal from the Order Entered September 3, 2025
In the Court of Common Pleas of Northumberland County Civil Division at
No(s):  CV-25-1469

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:　　　　　　　**FILED: AUGUST 6, 2026**

Alex Barak ("Barak") appeals pro se from the order entered by the Northumberland Court of Common Pleas ("trial court") granting the petition filed by Jenna Barker ("Barker") pursuant to the Protection from Abuse ("PFA") Act.[1]  After careful review, we affirm.

Barak and Barker were in a brief romantic relationship that ended on August 3, 2025.  On August 6, 2025, Barker, who was days shy of her twenty-first birthday and pregnant at the time, filed a PFA petition against Barak, who was twenty years her senior.  She alleged that Barak "groomed" her and subjected her to mental and emotional abuse, manipulation, threats, and harassment.  PFA Petition, 8/6/2025, ¶¶ 11-12.  She further alleged that

---

[1] 23 Pa.C.S. §§ 6101-6122.

Barak isolated her and prevented her from leaving their residence. *Id.* She included that she was scared Barak would hurt her and her unborn child. *Id.*, ¶ 12. The trial court granted a temporary protective order and held a hearing on the petition on September 3, 2025.

At the hearing, Barker, who was represented by counsel, testified that Barak was very controlling and she was "not allowed to do anything without asking [his] permission." N.T., 9/3/2025, at 6-7. She described him as a "control freak who has lost control." *Id.* at 11. Although she labeled their relationship as "peaceful," she testified that it was "his way or no way." *Id.* at 7. Barker testified that she was early in her pregnancy with Barak's baby when, on August 3, 2025, he came into the house with the mail, took her phone away from her, and "berated" her about how she was not living her life "right." *Id.* at 7, 11. She testified Barak was angry that she made plans to spend time with her parents without asking his permission. *Id.* at 7. After some time, he told her, "Fine, if you don't want to be with me, then leave." *Id.*

Barker called her aunt at around 8:00 p.m. to pick her up; she arrived quickly and waited nearby until Barker was able to leave the house two hours later at about 10:00 p.m. *Id.* at 7-8, 10. After calling her aunt, Barker said she went upstairs to pack her belongings. *Id.* at 8. Barak instead wanted to talk and although she willingly engaged in conversation, she also told him multiple times that she no longer wished to talk and wanted to leave. *Id.* at

8-9. She testified that Barak was unhappy with her for being very upset and appeared anxious, pacing back and forth. *Id.* at 10. While talking, Barker said she tried to get up from where she was sitting three times, but Barak prevented her by pushing his hand down on her knee and telling her to "just stay here." *Id.* at 9. She testified that Barak was also unhappy that she kept getting up to check her phone for messages from her aunt, who was repeatedly calling to make sure Barker was okay. *Id.* at 10. Barker told her aunt not to wait for her, but Barker said her aunt stayed because she "knew it wasn't okay to leave" Barker there. *Id.* Barak offered to separate, with one of them staying at another one of his properties, but Barker refused. *Id.* at 9. When she realized "he was really not going to let [her] leave," she convinced him she was just going to spend the night at her aunt's house, and he eventually agreed. *Id.* She acknowledged that Barak did not physically prevent her from leaving the house, and would not have "grabbed" her if she tried, but testified that she was concerned for her safety. *Id.* at 9-10. She further testified that after she left, they messaged each other and he was "acting like a completely different person"; he offered to pay for her to have an abortion but also told her he wanted full custody of their unborn child because she would be a "terrible mother." *Id.* at 11. She testified that although Barak did not scream or hit her, he scared her because "he likes to have full control and [she] took that away from him." *Id.* at 7, 11.

Barak, on the other hand, did not agree he was controlling, instead testifying that he has "standards." *Id.* at 15. He testified that Barker was a "very loving" person with a "great personality" but her "urge" to hang out with friends caused conflict because he was trying to build a family. *Id.* He said they had disagreements "about food that she want[ed] to eat" and that he helped her stop vaping and smoking marijuana. *Id.* at 20. He testified he never "would want to harm anybody, especially her." *Id.*

Barak stated that he and Barker were engaged to be married on August 7, 2025. *Id.* at 17. He arranged for Barker to be represented by an attorney, who he hired and paid for on her behalf, to review a prenuptial agreement. *Id.* at 16, Def. Ex. A (proposed prenuptial agreement). On August 1, 2025, he took Barker to a meeting with the attorney. *Id.* at 16. Barak said that when Barker did not agree to the terms or sign the prenuptial agreement, there was "some tension" and he was "offended." *Id.* at 16-17. He testified that he told Barker that if she wanted to get married, she would have to sign the agreement but if she refused, they could still stay together and raise their child. *Id.* at 17. Further, Barak would have required Barker to quit her job, not drive, and give her vehicle to her aunt instead of selling it. *Id.* at 27, Def. Ex. B (email between parties' attorneys). He wanted Barker to be a housewife. *Id.* at 28. He explained that as head of their family, he would control their finances and transportation; when Barker needed to go somewhere, he would go with her. *Id.* He said he needed to accompany her

- 4 -

because he wanted to "feel secure" because "she has a lot of guys that are always hitting on her." *Id.* at 29.

As for the date of the incident that led to Barker's PFA petition, Barak acknowledged grabbing and taking away her phone. *Id.* at 13. He agreed he was "offended" Barker made plans with her family without involving him in the discussion. *Id.* Barak testified that he has cameras "everywhere" inside his house and that Barker had access to them. *Id.* at 13-14. He insisted he "never forced her to stay" and did not stop her from leaving, but rather "just tried to negotiate with her to stay because [he] wanted to work it out." *Id.* at 13-15, 19. When Barker's aunt arrived at the house, he told Barker to "please go outside, tell [her] you're okay, [and] come back inside so we can talk," which she did. *Id.* at 26-27. He admitted he put his hand on her knee, but testified it was "gentle" as he calmly asked her to listen to him and "work this out." *Id.* at 14-15, 24. Whenever Barker stood up from where she was sitting, Barak said he asked her to sit back down so they could talk. *Id.* at 25. The trial court admitted a thirty-second video clip of his living room which showed the two of them embraced in an extended hug at about 10:00 p.m. that night, just before Barak opened the door and Barker walked out of the house. *Id.* at 19, 21, 30, Def. Ex. (August 3, 2025 video clip).[2]

---

[2] The trial court did not assign an exhibit identifier to the video clip at the hearing, presumably because Barak failed to bring a digital file copy for submission to the court; he later filed it upon order of the trial court. *See* Trial Court Order, 9/16/2025; N.T., 9/3/2025, at 19, 30.

Barak said he was "shocked" Barker wanted to leave when they were expecting a baby and admitted that after she ended the relationship, he offered to pay for an abortion because he was "being robbed of a baby" by her leaving, though he testified he now felt the baby was a blessing. *Id.* at 14. Barak acknowledged that after that night, their text messages "escalated" and he "may have said some things in a way that might have triggered" Barker, including his filing for custody, but said it was "only normal to react that way" when he was "heartbroken" and his family "was falling apart." *Id.* at 18-20. He denied threatening Barker or "any type of abuse," saying he was a "very good person" without a criminal record or history of violence. *Id.* at 17-19, 22. The trial court admitted those text messages between the parties, along with photographs of the couple in happier times. *Id.* at 17-19, 30, Def. Exs. C (text messages), D (photographs). Finally, he testified that he believed Barker filed the PFA petition as leverage in an anticipated custody battle. *Id.* at 20-21.

At the conclusion of testimony, the trial court acknowledged that "[o]bviously there wasn't physical abuse" before hearing closing arguments. *Id.* at 31. Barker's counsel argued that Barak substantially interfered with her liberty while Barak argued that she was free to leave anytime. *Id.* at 31-33. At the conclusion of the hearing, the trial court granted Barker's request

and issued a final PFA order for one year.[3]  Barak timely appealed to this Court

and presents the following issues for our review:

1.     Did the trial court err in granting a PFA without identifying a statutory basis for abuse under 23 Pa.C.S. § 6102?

2.     Did the trial court err in finding "substantial interference with liberty" where [Barker] admitted she could leave at any time?

3.     Did the trial court err by granting a PFA when [Barker] testified that [Barak] never physically harmed or threatened her?

4.     Did the trial court err in dismissing [Barak's] retaliation/custody leverage argument?

5.     Did the trial court err by relying on counsel's theory instead of competent evidence?

6.     Did the trial court abuse its discretion by issuing a one-year PFA despite acknowledging no physical abuse and only "some kind of something"?

7.     Did the trial court err in disregarding evidence that [Barker] voluntarily left the residence, returned of her own will, and departed calmly?

8.     Did the trial court err by disregarding [Barak's] testimony showing protective, family-centered intentions and absence of abuse?

9.     Did the trial court abuse its discretion by considering only a 30-second video clip while ignoring longer exculpatory recordings?

_____

[3] On September 24, 2025, the trial court amended its final order to correct the nature of the parties' relationship to current or former sexual or intimate partners, as opposed to spouses or former spouses.  Amended Final PFA Order, 9/24/2025.

Barak's Brief at 5 (reordered for ease of disposition).

Barak's first seven issues are related and we therefore address them together. The crux of Barak's argument is that there was no basis for the trial court to find "abuse" as defined in the PFA Act. In support, he points to his testimony that Barker left the house to tell her aunt she was okay, returned inside, and later exited again after giving him a hug to show that Barker had "freedom of movement" and "retained full liberty at all times." *Id.* at 7-8, 11-13, 15-17, 23, 26. He further contends that Barker's own testimony negates a finding of abuse, as she testified that if she wanted to leave the room, she could have and that he does not scream or hit her. *Id.* at 13, 15, 20. He argues that the trial court ignored his "objective" and "exculpatory" evidence in favor of Barker's "weak" testimony and her counsel's arguments. *Id.* at 8-9, 20-21, 23-24, 26. According to Barak, the trial court must have recognized the weakness of Barker's case because it offered him a no-contact agreement before the hearing and it granted the PFA petition for one year, not three as Barker requested. *Id.* at 9, 21-22. He also argues that the trial court deprived him of a fair hearing and demonstrated its bias when it interrupted his testimony that Barker filed the PFA to gain leverage in a future custody action and informed him that because the parties' baby was not yet born, the PFA order would not address custody. *Id.* at 19.

We review this appeal pursuant to the following standard:

> In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion. The PFA Act

does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, i.e., enough to tip a scale slightly.

*Medina v. Green*, 348 A.3d 1113, 1117 (Pa. Super. 2025) (citation and quotation marks omitted). "We review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court." *Id.* (brackets, citation, and quotation marks omitted). "Assessing the credibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder." *Id.* (citation and quotation marks omitted). The trial court is free to believe all, some, or none of the evidence presented. *K.B. v. Tinsley*, 208 A.3d 123, 128 (Pa. Super. 2019). "Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence." *Medina*, 348 A.3d at 1117 (citation and quotation marks omitted).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Id.* (citation and quotation marks omitted). The PFA Act defines abuse as follows:

The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape,

- 9 -

involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a). "Because the goal of the PFA Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the PFA Act to apply, and past acts are relevant to determine the reasonableness of the petitioner's current fear." ***E.K. v. J.R.A.***, 237 A.3d 509, 522 (Pa. Super. 2020) (citation omitted).

At the conclusion of the hearing, the trial court did not explain the basis for its decision to grant Barker's petition and the PFA order does not identify which subsection of section 6102 serves as the basis for the order. In its opinion, the trial court explains that it found Barker's testimony credible and that abuse occurred under subsections (a)(3) and (a)(5):

> Barak's own testimony corroborated Barker's assertion that Barak is very controlling and on this occasion, and others, substantially interfered with her liberty. Barker stated she is concerned for her safety because Barak is a control freak who has lost control. The testimony established Barak knowingly engag[ed] in a course of conduct (controlling behavior and not allowing Barker to go places without him and needing to know where she is going and who she is with) or repeatedly committing acts toward Barker, under circumstances which place the person in reasonable fear of bodily injury.

Trial Court Opinion, 12/29/2025, at 5 (pagination supplied and party designations altered).

At the outset, we note that there is no merit to Barak's argument that the trial court's issuance of a one-year order of protection indicates that Barker's claim of abuse was not supported by sufficient evidence. *See* Barak's Brief at 9. The trial court has authority to issue a PFA order "for a fixed period of time not to exceed three years." 23 Pa.C.S. § 6108(d). The trial court acted within its authority by issuing an order for one year. The length of time the order of protection is in place has no bearing on the sufficiency of the evidence to support a finding of abuse.

Further, Barak's argument that a lack of physical harm means no abuse occurred is belied by the law. *See* Barak's Brief at 13-14. As our recitation of the PFA Act reflects, there are several bases for finding "abuse" that do not require physical harm have already befallen the victim. *See* 23 Pa.C.S. § 6102(a). Moreover, our precedent is clear that the aim of the PFA Act is to be proactive, not reactive, in the prevention of physical harm. *See E.K.*, 237 A.3d at 522.

Turning our attention to the sufficiency of evidence to support the trial court's order, we focus our analysis on subsection (a)(3), which defines abuse as the infliction of false imprisonment. *See* 23 Pa.C.S. § 6102(a)(3). Under our Criminal Code, a person commits false imprisonment "if he knowingly restrains another unlawfully so as to interfere substantially with h[er] liberty." 18 Pa.C.S. § 2903(a). "In determining the magnitude of restraint necessary for false imprisonment, this Court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint." *In the Interest of M.G.*, 916 A.2d 1179, 1181-82 (Pa. Super. 2007) (footnotes omitted). We construe the word "substantially" according to its plain meaning and have determined that "the Legislature intended false imprisonment to cover restraints where an individual's liberty is interfered with in an ample or considerable manner." *Id.* at 1182 (citing 1 Pa.C.S. § 1903; Merriam Webster's Collegiate Dictionary 1174 (10th ed. 1997)). Neither threats, intimidation, nor physical force is required to prove that someone has restrained another unlawfully under the false imprisonment statute. *Id.* (citations and quotation marks omitted).

Viewing the evidence in the light most favorable to Barker, as the prevailing party, the record reflects that the parties were in a very brief relationship and although the record is unclear as to when it started, by Barker's account it was June 2025. *See* Barker's Brief at 3. She lived in Barak's home, where Barak had cameras "everywhere" recording her

movements inside the residence. N.T., 9/3/2025, at 13-14. She could not do anything without asking his permission and she could not go anywhere without him. *Id.* at 7, 28-29. Indeed, the incident that precipitated Barker's filing involved Barak's anger over plans she made with her family without first consulting him. *Id.* at 7.

Two months into their relationship, they were engaged and Barak insisted Barker sign a prenuptial agreement or he would not marry her. *Id.* at 17. Barak also controlled her livelihood and transportation, requiring her to quit her job and give up her car. *Id.* at 27, Ex. B. Although he arranged for an attorney to review the prenuptial agreement on her behalf, it was a lawyer of his choosing. *Id.* at 16. When asked on cross-examination about his prior testimony that he had worked to make Barker an "independent person," he corrected himself by saying, "I didn't mean independent. I meant basically healthy and free of any type of health issues. I didn't mean independent financially." *Id.* at 27. He also confirmed that he would control their finances. *Id.* at 28.

Although Barak did not use threats or undue physical force to confine Barker on August 3, 2025, that is not what is required under the statute. *See In re M.G.*, 916 A.2d at 1182. When Barker decided she wanted to leave the home, she had to ask someone to pick her up. *Id.* at 7. Although her ride arrived immediately, Barak instructed her to go outside to assure her aunt that she was okay and to come back inside. *Id.* at 26. That Barker

temporarily exited and returned to the residence does not negate the control Barak exerted over her liberty; the trial court, sitting as factfinder, could reasonably infer she was merely complying with his directive. As Barker argues in her brief, this is evidence of her capitulation to his pressure. ***See*** Barker's Brief at 14.

Despite her aunt's arrival and repeated calls with concern for Barker's well-being, Barker was unable to leave the house for two hours. ***Id.*** at 8, 10. Each time she tried to get up, Barak pushed his hand down on her knee while telling her to "just stay here." ***Id.*** at 9, 24. Barak admitted this, and though he characterized it as "gentle," he did not deny its effect: to keep Barker seated when she tried to get up. ***Id.*** at 14, 24. Barker told him multiple times that she no longer wished to talk and wanted to leave; Barak took away her phone, followed her through the house—both upstairs and back down—continued to press her for conversation, tried to stop her from standing up, monitored her contact with her aunt, and expressed his unhappiness with her aunt's calls to check on her well-being. ***Id.*** at 7-10, 13. Although she was able to periodically check her phone, it was under Barak's watch. ***Id.*** at 10. When she realized "he [wa]s really not going to let [her] leave," she resorted to deception, convincing him she would just spend one night with her aunt, before he finally agreed to let her leave the house. ***Id.*** at 9. That Barker had to negotiate her exit from the home and mispresent her plan to leave the

house plainly supports the trial court's determination that she was not free to leave.

In sum, the power imbalance between the parties and Barak's considerable interference with Barker's liberty is evident from the record, which shows a pregnant woman in the home of a man twenty years older than she, who required his permission to do anything, and required him to escort her anywhere she went. He video-recorded her movements throughout his home, instructed her to give up her job and car, became angry when she made plans with her own family without consulting him, took away her phone, and controlled her finances. On the day in question, he attempted to restrain her from leaving his home, followed her around his house when she wanted to leave, was "offended" by calls to check on her well-being, and hindered her attempts to leave for two hours.

Barak's arguments relating to the parties' hug shown on the video before Barker finally left his residence and his testimony that she filed a PFA petition to gain leverage in a future custody action go to the weight of the evidence, not its sufficiency. It was for the trial court to determine what weight, if any, to afford that evidence. *See K.B.*, 208 A.3d at 128. Indeed, the trial court could plausibly have viewed the hug as a means Barker employed to escape the situation and not credited his "custody battle" testimony because their child had not yet been born. Further, we must accept the trial court's factual

findings and its determination that Barker's testimony was credible as both are supported by the record. **See Medina**, 348 A.3d at 1117.

Viewed in the light most favorable to Barker, as our standard of review requires, we conclude that a preponderance of the evidence shows that Barak knowingly restrained her so as to substantially interfere with her liberty. **See id.**; **see also Harper v. Nye**, 680 MDA 2023, 2024 WL 195740, *3 (Pa. Super. Jan. 18, 2024) (non-precedential decision) (affirming trial court's finding of abuse under section 6102(a)(3) of the PFA Act where husband restricted wife from coming down the stairs of their house while screaming at her and spitting in her face).[4]  Accordingly, we discern no error in the trial court's finding that abuse occurred under section 6102(a)(3) of the PFA Act. No relief is due as to Barak's first seven issues.

Turning to his eighth issue, that the trial court erred in failing to credit his testimony as to his family-centered intentions and the absence of abuse, we find this claim waived.  Barak failed to preserve this claim in his concise statement of errors complained of on appeal.  **See** Pa.R.A.P. 1925(a) Statement, 9/8/2025; **see also** Pa.R.A.P. 1925(b)(4)(vii); **Bartlett v. Demich**, 307 A.3d 736, 740 (Pa. Super. 2023) ("Failure to include an issue in a concise statement of issues raised on appeal results in waiver of the issue."). Even if preserved it, this again seeks for us to reweigh the evidence in a way

_____

[4] Non-precedential decisions filed after May 1, 2019 may be cited for their persuasive value.  Pa.R.A.P. 126(b).

contrary to the trial court's findings and for this Court to view the record in light favorable to him, neither of which is permissible on appeal. No relief is due.

Finally, in his ninth issue, Barak argues that the trial court "mishandled"' his video evidence by only considering a thirty-second clip even though he offered to present additional footage. Barak's Brief at 17. He contends that the trial court's inquiry about the video's length "placed pressure" on him to limit his evidence to just the short clip. *Id.* at 18. As a result, he argues that the court ignored other relevant footage. *Id.* The record belies Barak's claim entirely. It reflects that Barak offered, and the trial court admitted, the video clip at issue. N.T., 9/3/2025, at 30. When Barak offered the thirty-second video clip, he also indicated to the trial court that he had additional footage from the living room. *Id.* at 19. The following exchange occurred:

THE COURT: This video you have, is this of the day that [Barker] is talking about?

[BARAK]: Correct. Yes. I have it on my iPad. I could show it to you whenever you are ready.

THE COURT: You have to show it to her attorney. First of all, how long is the video?

[BARAK]: I cut a small piece of her just giving me a hug, 30 seconds.

THE COURT: Well, show it to counsel first. Then I can –

[BARAK]: I didn't want to take too much of your time.

THE COURT: That's fine. That's what I'm here for. Show it to counsel and then I'll take a look at it.

(Judge Rosini reviewed the video.)

THE COURT: Anything else you want me to know, sir?

[BARAK]: Just go to Exhibit F [(Barker's PFA petition)], which is the obvious, she filed the PFA on the 6th.…

*Id.* at 21-22.

There is simply no support for Barak's suggestion that the trial court unduly pressured him to only offer an abbreviated video clip, as opposed to longer video footage. To the contrary, the trial court expressly assured Barak when he was concerned about length of the video that it was "fine" and this is what it was "here for," i.e., to hear all evidence that both sides had to present in support of their respective cases. *Id.* The court followed up by asking Barak if he had anything further to offer, but Barak did not seek to admit any additional evidence. *See id.* We discern no error by the trial court. *See E.K.*, 237 A.3d at 522-23. No relief is due.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/06/2026

- 18 -